UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF LOUISIANA

IN RE:

**SCOTT ANTHONY WEBER**                                CASE NO. **09-11820**
**KIMBERLY LYTLE WEBER**

DEBTORS                                                CHAPTER 7


**DENNIS LYTLE**
**RAMONA LYTLE**

PLAINTIFFS

V.                                                     ADV. NO. **10-1005**

**SCOTT ANTHONY WEBER**
**KIMBERLY LYTLE WEBER**

DEFENDANTS

## MEMORANDUM OPINION

Plaintiffs Dennis and Ramona Lytle sued debtors Scott and Kimberly Weber for a declaration that the Webers' debt to the plaintiffs, now the subject of a state court default judgment, is nondischargeable under 11 U.S.C. §§523(a)(2)(A), (a)(4) and (a)(6). This opinion explains the basis for the court's ruling that the Lytles' claim of $44,978 against the Webers is nondischargeable as to Kim Weber only.

## FACTS

The plaintiffs sought to build a comfortable home at a reasonable cost on a lot in the University Club Plantation subdivision in Baton Rouge after moving from Little Rock, Arkansas in late 2007. They hired Lighthouse Construction, L.L.C. ("Lighthouse"), a licensed general

contractor owned by Scott Weber and his wife Kim, who is plaintiff Dennis Lytle's sister.[1] Scott Weber supervised the work; Kim Weber maintained Lighthouse's books. The construction project took from April 2008 until November or December 2008. The Lytles agreed to pay $379,713 for the project[2] but the price eventually exceeded $457,000.[3]

Plaintiffs carefully monitored the project, making notes and photographing the work.[4] Dennis Lytle testified that he believed Lighthouse was paying for all the work as the project advanced: he said that the debtors assured him that the job was progressing well[5] and that Lighthouse was paying its subcontractors and suppliers timely.

The Lytles paid Lighthouse $306,770.40[6] before declining to make the final contract payment when they learned of problems that included Lighthouse's failure to pay subcontractors and materialmen. Lytle insisted he would not have made the progress payments had he known of Lighthouse's breaches.

The evidence established that throughout the project the plaintiffs sought information about Lighthouse's use of their money. Dennis Lytle testified that he first asked the debtors for an actual accounting, including cancelled checks, as early as May 2008 after the first progress payment. Kim Weber agreed to get the materials together and respond to him. Though Lytle

---

[1] March 10, 2008 "Contractor Agreement" between Dennis and Ramona Lytle and Lighthouse Construction, L.L.C. (Lytle Exhibit 1).

[2] The March 10, 2008 Lighthouse Construction, L.L.C. Cost Break Down (Lytle Exhibit 2) estimated the total cost of the construction at $379,713.

[3] Snowy Egret House Build Accounting Summary dated March 2009 (Weber Exhibit 3).

[4] The Lytle's care in monitoring the construction may have been attributable in part to Dennis Lytle's Louisiana State University degree in construction management.

[5] Scott Weber, on the other hand, testified that he repeatedly told Lytle the project was going over budget on many items.

[6] The $306,770.40 comprised a cashier's check for $15,000, three checks of $72,942.60 each and an electronic funds transfer for $72,942.60. (Lytle Exhibit 3).

anticipated that the defendants would need time to gather the information, the summer advanced without his receiving anything. In July 2008, Lytle "sternly demanded" financial information from the Webers, who repeatedly put him off. In September 2008, nearly four months after he first asked for information, Kim Weber told Lytle she had prepared a document showing the application of plaintiffs' progress payments but claimed that Scott Weber had told her not to provide it to Lytle. Again in October 2008 Kim told Dennis that Scott Weber would not let her give the information to Lytle.

Kim Weber finally gave Dennis Lytle a listing of estimated and actual costs for the construction project on November 3, 2008,[7] explaining that Lighthouse had paid the amounts listed in the column captioned "actual."[8] However, Kim did not furnish any corroboration that Lighthouse actually had made the payments on the list.[9] When Lytle rejected the document as "unacceptable" because it comprised "only numbers" without backup, Kim agreed to provide more information. She also told him that he needed to meet with her and her husband if he really wanted an explanation of the numbers on the breakdown. Yet when Lytle agreed to meet with the defendants Kim Weber put him off, claiming that Scott was not available at the time. In any case, Lytle testified that the plaintiffs began "to feel really shaky" once they received the November 3, 2008 cost breakdown and began to suspect that the debtors were "concealing something."

---

[7] Lighthouse Construction L.L.C. Cost Break Down dated November 3, 2008 (Lytle Exhibit 5).

[8] Kim Weber testified that the "actual" figures represented their "cost," rather than amounts Lighthouse actually had paid. However, at least one entry on the breakdown belies this contention. The cost breakdown lists both the "estimated" and "actual" amounts for electrical work at $18,765. In fact, the evidence established that Lighthouse actually paid $14,216.70 to the electrical contractor, Central Electric Co, L.L.C. Kim Weber verified that this payment was reflected in a Lighthouse check dated August 3, 2008. (Exhibit Weber 3).

[9] Dennis Lytle testified that as of the trial he still had not received copies of checks confirming that either Lighthouse or the debtors had paid its subcontractors.

After the home was finished in late November or early December 2008,[10] Kim Weber asked her brother for a check to pay some subcontractors to whom Lighthouse owed money. Dennis Lytle gave her a personal check for $12,145.32, noting in the check's memorandum section the names of the creditors and the amounts paid for each.[11] Kim Weber explained to her brother that the payment would settle all amounts Lighthouse owed on the project. In fact, Lytle said that Kim told him the amount for Angelle Concrete Group, L.L.C. ("Delta/Angelle"),[12] one of the contractors, actually was to *reimburse* Lighthouse for payments it already had made to Delta. Lytle conceded that he probably should have asked Lighthouse to obtain a lien waiver from Delta/Angelle but did not because, even though he had some concerns by then, he trusted the Webers to pay the project costs as the contract required.

Later in December 2008, Kim Weber asked Lytle for an additional $27,531.65 to pay Lighthouse's subcontractors and materialmen; she identified only Central Electric Co., L.L.C. ("Central Electric") specifically. For a second time Kim told Dennis that the check was the last one Lighthouse needed to satisfy claims associated with the project and that it "would settle everything." Lytle did not believe that plaintiffs still owed as much as $27,531.65 on the job and so before he agreed to give Lighthouse the money, Lytle demanded an accounting – for at least the fourth time. Despite that, and notwithstanding (1) Ramona Lytle's opposition to giving the Weber's another check, (2) Lytle's skepticism about the significant balances Weber claimed

---

[10] Dennis Lytle testified that the work ended in December 2008. However, neither party offered a certificate of substantial completion for the home.

[11] December 2, 2008 personal check number 2290 (Lytle Exhibit 10). The creditors were Delta Concrete - $5176.82, Todd Jackson - $4600.00 and Southern Bath - $2365.50. Lytle testified that the three sums totaled $12,145.32 though they actually added up to $12,142.32.

[12] Lytle referred to Delta Concrete and Angelle Concrete interchangeably. For brevity this memorandum opinion refers to the concrete company as Delta/Angelle.

4

were due and (3) the defendants' repeated failure or refusal to deliver an accounting, on December 19, 2008, Lytle gave Weber a check for $16,952.15.[13] Lytle never received confirmation that Lighthouse paid the subcontractors and suppliers Kim claimed the December 19 check would cover.

Despite Kim's assurances, the December 2008 payments did not resolve all claims associated with the home building project. Plaintiffs later learned that Lighthouse had failed to pay several subcontractors and materialmen, including three whose claims the plaintiffs themselves eventually had to resolve: McConnell Brick & Block Company, Inc. ("McConnell"), Delta/Angelle Concrete, and Central Electric.[14]

McConnell Brick

Dennis Lytle called his sister after the Lytles received McConnell's February 5, 2009 demand letter. She counseled him not to worry about the invoices because the claim was only a lien against his home[15] and that "they" would "take care of it." However, no evidence established that the Webers or Lighthouse ever paid McConnell. For the first time in plaintiffs'

---

[13] December 19, 2008 personal check number 2302 (Lytle Exhibit 15). From the $27,531.32 Kim Weber demanded Lytle noted on the memo section deductions of $4929.50 for a disputed amount owed to Central Electric and of $5,650 for security deposits the Lytles previously provided for**.**

[14] See Lytle Exhibits 6, 7 (McConnell demand letter and invoices), 11 (Delta/Angelle statement of claim and privilege), 13 (Central statement of claim and privilege). Dennis Lytle identified other subcontractors and materialmen that the plaintiffs paid after Lighthouse failed to pay them, including Acoustic Floors, B's Custom Stoneworks, Shell Boze and PPG as well as a stucco subcontractor and concrete finisher. Because the plaintiffs offered no evidence of the amount they paid to those subcontractors and materialmen, the evidence does not support a finding that those payments were made because *Lighthouse* improperly failed to pay them.

[15] The Louisiana Private Works Act, La. R.S. 9:4801 *et seq.*, allows subcontractors and materialmen to file privileges against immovable property on which they perform work or for which they furnish materials. Specifically, under La. R.S. 9:4802(A)(1) subcontractors and material suppliers may sue both the owner of the immovable and the contractor to recover payment for their work or materials. The procedure for preserving and enforcing the privilege afforded under R.S. 9:4802(A)(1) is described below in footnote 17.

dealings with the defendants, instead of relying on Kim Weber's assurances the Lytles negotiated a plan to pay McConnell over time and thereby avoid a lien on their home.[16]

Delta/Angelle Concrete

In March 2009, more than three months after Kim Weber convinced Dennis Lytle to give her funds to pay for the driveway concrete (or reimburse Lighthouse for its payment), the concrete supplier sued the plaintiffs and filed a Louisiana Private Works Act privilege against their home.[17] Delta sought payment of $5,176.82 plus attorney's fees and costs.

Central Electric

In November 2009, nearly a year after the house was finished, Central sued the Lytles and Lighthouse to recover $8,757.30 for electrical work, plus attorney's fees and costs.[18] Central had filed a statement of private works act privilege against the property in February 2009.[19]

The demand by McConnell and the lawsuit by Delta/Angelle led Dennis Lytle, his lawyer, Kim Weber and an "advisor" to meet in March 2009 to try to resolve differences concerning unpaid subcontractors and suppliers. Dennis Lytle testified that during the meeting Kim Weber apologized and admitted that the Webers had misused or mishandled the Lytles'

---

[16] February 12, 2009 promissory note for $3379.39 in favor of McConnell Brick and payment receipts (Lytle Exhibit 8); May 20, 2009 letter from McConnell Brick to plaintiffs (Lytle Exhibit 9).

[17] March 17, 2009 petition in matter styled "Angelle Concrete Group, L.L.C. v. Dennis A. Lytle and Ramona B. Lytle," No. 588-610 in the Nineteenth Judicial District Court for East Baton Rouge Parish, Louisiana (Lytle Exhibit 12); Statement of Claim and Privilege by Angelle Concrete Group LLC (Lytle Exhibit 11). See La. R.S. 9:4802(A)(1), 4822(A) and 4823(A)(2). To preserve the privilege afforded by La. R.S. 9:4802(A)(1), a subcontractor must file a statement of claim or privilege within sixty days following the filing date of a notice of termination or substantial completion of the work. La. R.S. 9:4822(B). The subcontractor must act to protect the privilege from extinguishment by suing the immovable owner to enforce the privilege within one year after the expiration of the time for filing the statement of privilege. La. R.S. 9:4823(A)(2).

[18] November 17, 2009 petition in matter styled "Central Electric Co., L.L.C. v. Lighthouse Construction, L.L.C., Dennis Lytle and Ramona Lytle," No. 588-610 in the Nineteenth Judicial District Court for East Baton Rouge Parish, Louisiana (Lytle Exhibit 14).

[19] Statement of Claim and Privilege by Brian Biggers d/b/a Central Electric Co., L.L.C. (Lytle Exhibit 13).

money, which did not "go where it was supposed to go."[20] At trial, Kim Weber denied misusing the Lytles' money, denied telling Dennis Lytle she had misused any of the Lytle's money and denied telling him that Lighthouse had paid any subcontractors and materialmen it had not paid.[21]

Eventually the Lytles sued Lighthouse and the Webers in state court for an accounting and damages.[22] They obtained a default judgment on October 15, 2009 against both Lighthouse and the debtors for $39,978.00 and $5,000 in attorney fees. The Webers filed a joint chapter 7 petition on November 19, 2009.

## ANALYSIS

1. *The State Court Judgment is not Res Judicata Regarding All the Elements of Proof under 11 U.S.C. §523(a).*

The Lytles hold a final, non-appealable state court money judgment against the debtors individually and Lighthouse. The *Rooker-Feldman* doctrine[23] bars this court from revisiting that judgment because "'inferior federal courts do not have the power to modify or reverse state court

---

[20] Henry Grady Smith, Jr. was defendants' sole non-party witness. Before testifying, Smith drew a reprimand after the court observed him signaling to Mrs. Weber from the spectators' seating during her examination. Smith explained that he was a lawyer although he claimed that he had not practiced in Louisiana since the 1970's. Smith later testified as a rebuttal witness, stating that he was at the March 2009 meeting as the Webers' advisor (in fact, Mrs. Weber testified that he "did most of the talking" at that meeting). He also insisted that Kim Weber had made none of the admissions to which Dennis Lytle testified. The court gives no weight to Smith's testimony both because of his attempts to coach Mrs. Weber during her testimony and also because of his demonstrable bias in favor of the Webers. In combination, they render his testimony completely incredible.

[21] Lytle previously had testified in state court concerning his sister's admissions at the March 2009 meeting, and specifically that she and her husband had used some of the Lytles' funds to pay personal expenses. Transcript of October 15, 2009 hearing on confirmation of default judgment in matter styled "Dennis and Ramona Lytle v. Lighthouse Construction, L.L.C.," No. 579-866 in the Nineteenth Judicial District Court for East Baton Rouge Parish, Louisiana, at page 11 (Weber Exhibit 1.)

[22] June 29, 2009 Petition for Accounting and Damages for Misappropriation of Funds in matter styled "Dennis and Ramona Lytle v. Lighthouse Construction, L.L.C.," No. 579-866 in the Nineteenth Judicial District Court for East Baton Rouge Parish, Louisiana (Lytle Exhibit 16.)

[23] This doctrine derives from two United States Supreme Court decisions, *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983) and *Rooker v. Fidelity Trust Co.*, 263 U.S. 413, 44 S.Ct. 149, 68 L.Ed.2d 362 (1923).

judgments.'" *Union Planters Bank v. Salih*, 369 F.3d 457, 462 (5th Cir. 2004), quoting *Matter of Reitner*, 152 F.3d 341, 343 (5th Cir. 1998). Nonetheless, a bankruptcy court considering a state court money judgment "is not bound by the judgment and is not barred by res judicata or collateral estoppel from conducting its own inquiry into the … dischargeability of the debt." *Carey Lumber Co. v. Bell*, 615 F.2d 370, 377 (5th Cir. 1980).

   2. *Plaintiffs Did Not Prove They Justifiably Relied on Kim Weber's Misrepresentations as Required Under 11 U.S.C.§ 523(a)(2).*

Bankruptcy Code section 523(a)(2)(A) bars discharge of a debt obtained by "false pretenses, a false representation, or actual fraud …." To succeed under 11 U.S.C. §523(a)(2)(A), the objecting party must prove that: (1) the debtor made representations; (2) at the time they were made the debtor knew they were false; (3) the debtor made the representations with the intention and purpose to deceive the creditor; (4) the creditor relied on the representations; and (5) the creditor sustained losses as a proximate result of the representations. *RecoverEdge L.P. v. Pentecost*, 44 F.3d 1284, 1293 (5th Cir. 1995); *In re Bercier*, 934 F.2d 689, 692 (5th Cir. 1991).

Plaintiffs established that Kim Weber repeatedly misrepresented facts to Dennis Lytle and that the plaintiffs sustained losses as a result of her misrepresentations. The only remaining issues for purposes of determining dischargeability under section 523(a) are Weber's knowledge and intent, and whether the plaintiffs relied on her misrepresentations.

   a.  Weber's Intentional Misrepresentations

Fraud or misrepresentation rendering a debt nondischargeable under section 523(a)(2)(A) can be based on any type of conduct calculated to convey a misleading impression; whether the representation is express or implied is not significant. *In re Acosta*, 2003 WL 23109775 at *13 n. 166 (E.D. La. 2003), citing *In re Wyant*, 236 B.R. 684, 695 (Bankr. D. Minn. 1999). Nor need a party have made an affirmative statement to have committed fraud, which also can arise from

8

the failure to disclose a material fact. *In re Docteroff*, 133 F.3d 210, 216 (3d Cir. 1997). *See also In re Mercer*, 246 F.3d 391, 404 (5th Cir. 2001) ("A misrepresentation need *not* be spoken; it can be made through conduct.") (Emphasis in original.)

Additionally, section 523(a)(2)(A) requires that the debtor's misrepresentation be *intentional*. The evidence established that Kim Weber continuously and purposely gave the Lytles false information concerning the ongoing payment of costs associated with their home construction, and so plaintiffs proved her intent to deceive them.

Dennis Lytle began asking the debtors for an accounting on the construction project no later than May 2008. Kim Weber repeatedly agreed to give Lytle an accounting while all along assuring him that Lighthouse was paying for all the work as the project went forward. She eventually delivered a cost breakdown in November 3, 2008 that lacked supporting documentation, at the same time telling Lytle that amounts listed in the document's "actual" column represented sums Lighthouse already had paid for work and materials. However, the evidence established that Kim Weber misrepresented to the plaintiffs through the cost breakdown the amounts that Lighthouse had paid its subcontractors and materialmen to induce the Lytles to pay even more to Lighthouse.

Kim Weber's brazen misrepresentations continued into December and convinced her brother to give her a check on December 2, 2008 to pay three subcontractors and materialmen including Delta/Angelle Concrete, which she falsely claimed Lighthouse previously had paid. She lied when she promised to use the proceeds of the check to pay the three subcontractors and materialmen, and again when she said their claims were the last associated with the homebuilding project. Kim Weber compounded her deceit only weeks later when she asked her brother for another check to pay more construction costs, again falsely claiming that it would be

9

the last check needed to settle all costs for the project. Evidence showed that in fact several subcontractors had not been paid in full by that date. For example, when Dennis Lytle asked his sister about the McConnell demand letter, she said that Lighthouse would "take care of it." Her prior actions, however, support an inference that she did not intend to "take care of" the McConnell debt.

Firm proof that Kim Weber had been lying came in March 2009 when Delta/Angelle sued the Lytles for money owed to it on the project, followed by Central Electric's November 2009 suit for amounts due on unpaid invoices.

Kim Weber finally admitted to Dennis Lytle in March 2009 that she and her husband had not used the Lytles' money to pay Lighthouse's subcontractors and materialmen. Although Weber denied saying this or telling her brother that Lighthouse had not paid some bills for the home project, neither Weber nor her "corroborating" witness are credible. Specifically, the testimony of Grady Smith, whom Weber called to corroborate her testimony, is totally unbelievable because of his bias in favor of the debtors. In contrast, Dennis Lytle's testimony was wholly credible. The plaintiffs therefore established beyond any reasonable doubt that Kim Weber lied to them.

    b. The Lytles' Reliance

As reprehensible as Kim Weber's misstatements were, misrepresentation alone is insufficient for nondischargeability. The Lytles also must prove that they justifiably relied on them. *Field v. Mans*, 516 U.S. 59, 70-71 (1995) citing RESTATEMENT (SECOND) OF TORTS § 545A cmt. b (1977). *See also Lewis v. Bank of America, N.A.*, 343 F.3d 540, 547 (5th Cir. 2003) (recognizing the application of a justifiable reliance standard for fraud in bankruptcy). Justifiable reliance is gauged by "an individual standard of the plaintiff's own capacity and the

10

knowledge which he has, or which may fairly be charged against him from the facts within his observation in the light of his individual case." *In re Vann*, 67 F.3d 277, 288 (11th Cir. 1995), citing *Prosser & Keeton on Torts* at 751. It is only where, under the circumstances, the facts should be apparent to one of the plaintiff's knowledge and intelligence from a cursory glance, or he has discovered something which should serve as a warning that he is being deceived, that he is required to make an investigation of his own. *Id*., citing *Prosser & Keeton on Torts* at 752.

Dennis Lytle has a bachelor's degree in construction management and has some knowledge of the construction business. The plaintiffs' careful monitoring of the construction by photographing and making notes, and acting to protect the property from tropical weather during the job when the contractor failed to do so, show unusual attentiveness to the progress of the work. However, Lytle overlooked warning signs that should have led him to investigate whether Lighthouse was promptly paying its subcontractors and material suppliers.

Dennis Lytle actually began asking Kim for an accounting on the project and corroborating cancelled checks in May 2008. He renewed his request "sternly" (his own words) in July 2008. Kim Weber lulled her brother until the defendants finally gave the Lytles a project accounting without any supporting documents in November 2008 after plaintiffs had made all but the final progress payment, by which time the plaintiffs were apprehensive about the project's finances. However, even after Lytles began to "feel shaky" about Lighthouse and to think that the Webers might be "concealing something," Dennis Lytle on December 2, 2008 gave his sister even more money – a $12,145.32 check – for construction charges she claimed were still owed. Lytle admitted at trial that he probably should have obtained a lien waiver from Kim then. Two weeks later, when Kim asked for the December 19, 2008 check, Dennis had even stronger

concerns about the disposition of the plaintiffs' payments. By then, even his wife had cautioned him against giving the debtors any more money.

In summary, as early as May or July 2008 and certainly by November 3, 2008 when he received the cost breakdown, Dennis Lytle knew facts that should have led him to suspect that Kim Weber was not being candid about the project's finances and the use of the progress payments.

The evidence established that the Lytles were not justified in relying on *anything* Kim Weber told them about Lighthouse's debts to subcontractors or materialmen by November 2008, before Dennis Lytle gave Kim the December 2, 2008 check. The plaintiffs' lack of justifiable reliance on Kim Weber's false representations defeats their demand that the Webers' debt to them should be nondischargeable under section 523(a)(2)(A).

    *3. Defendants are Not Plaintiffs' Fiduciaries under 11 U.S.C. §523(a)(4).*

The Lytles also contend that the Webers' debt to them is non-dischargeable under 11 U.S.C. §523(a)(4) which excepts from discharge debts "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." Plaintiffs argue that the debtors, through Lighthouse as the general contractor on their home construction project, owed them a fiduciary duty. They maintain that the contractor agreement itself created a trust relationship.

Not all fiduciary relationships fall within section 523(a)(4). The exception applies only to debts incurred during fiduciary relationships arising from technical or express trusts, and not from those the law implies from a contract. *In re Bennett*, 989 F.2d 779, 784 (5th Cir. 1993), citing *In re Angelle*, 610 F.2d 1335 (5th Cir. 1980). A constructive trust – that is, one arising from the wrongdoing of the alleged trustee – is not sufficient to create a fiduciary relationship within the meaning of section 523(a)(4). *Id*.

Plaintiffs cite no federal or state law to support their contention that Lighthouse or the Webers were the Lytles' fiduciaries for purposes of 11 U.S.C. §523(a)(4), and the evidence establishes that it was not a fiduciary relationship of the sort required to render their debt nondischargeable. First, the plaintiffs contracted with Lighthouse, not the debtors. Second, even assuming for the sake of argument that the plaintiffs had contracted with debtors themselves and that the law implied a trust relationship from that contract, that relationship would not create a fiduciary duty to plaintiffs for the purpose of §523(a)(4). Thus, in *Angelle* the Fifth Circuit concluded that a home construction contractor who had misappropriated funds advanced by his clients was not a fiduciary of those creditors under section 523(a)(4). *Angelle*, 610 F.2d at 1341. The court reasoned that a trust relationship between Angelle and the creditors could only have arisen from La. R.S. 14:202,[24] which makes a contractor's misappropriation of funds a criminal offense.[25] It concluded that a trust arising merely from Angelle's misappropriations did not render Angelle a fiduciary under the Bankruptcy Code.

---

[24] When the Fifth Circuit ruled in *Angelle* in 1980, La. R.S. 14:202 provided that: "Any person, contractor or subcontractor or agent of a contractor or subcontractor who has applied any money received on account of any contract including contracts and mortgages for interim financing, for the construction, erection, or repair of any building, structure, or other improvement to any other purpose than the settlement of claims for material and labor due or to become due for said construction or under the contract shall, in case of default on the contract, or default in payment of claims for material or labor, be fined not less than one hundred dollars nor more than five hundred dollars and imprisoned for not less than thirty days nor more than six months, and in default of fine, imprisoned for not less than thirty days nor more than six months additional."

[25] The Louisiana Legislature amended La. R.S. 14:202 in 1990 to read as follows:

A. No person, contractor, subcontractor, or agent of a contractor or subcontractor, who has received money on account of a contract for the construction, erection, or repair of a building, structure, or other improvement, including contracts and mortgages for interim financing, shall knowingly fail to apply the money received as necessary to settle claims for material and labor due for the construction or under the contract.

B. When the amount misapplied is one thousand dollars or less, whoever violates the provisions of this Section shall be fined not less than one hundred dollars nor more than five hundred dollars, or imprisoned for not less than ninety days nor more than six months, or both.

C. When the amount misapplied is greater than one thousand dollars, whoever violates this Section shall be fined not less than one hundred dollars nor more than five hundred dollars, or imprisoned with or without hard labor for not
*(Footnote continued on next page)*

In summary, no evidence established that the plaintiffs' relationship with the Webers was a fiduciary relationship within the meaning of 11 U.S.C. §523(a)(4), so the defendants' debt to plaintiffs is not nondischargeable under that Bankruptcy Code provision.

*4. Plaintiffs Proved Kim Weber's Actions Willfully and Maliciously Injured Them and are not Dischargeable Under 11 U.S.C.§ 523(a)(6).*

Section 523(a)(6) excepts from discharge debts "for willful and malicious injury by the debtor to another entity or to the property of another entity." The term "willful and malicious injury" is a single, unitary concept that is determined by two-pronged test: specifically, "an injury is 'willful and malicious' where there is either an objective substantial certainty of harm or a subjective motive to cause harm." *Matter of Miller*, 156 F.3d 598, 606 (5th Cir. 1998). *Miller* analyzed the elements of section 523(a)(6) following the Supreme Court's ruling in *Kawaauhau v. Geiger,* 523 U.S. 57, 118 S.Ct. 974, 978, 140 L.Ed.2d 90 (1998). It reiterated its definition of "willful and malicious injury" in *In re Caton*, 157 F.3d 1026, 1030 (5th Cir. 1998). In contrast, debts resulting from recklessly or negligently inflicted injuries do not fall within section 523(a)(6). *Kawaauhau v. Geiger*, 523 U.S. 57, 118 S.Ct. 974, 978, 140 L.Ed.2d 90 (1998).

More recently the Fifth Circuit has sharpened its analysis of the plaintiff's burden under section 523(a)(6). *In re Williams*, 337 F.3d 504 (5th Cir. 2003). It held in *Williams* that to render

---

less than ninety days nor more than six months, or both, for each one thousand dollars in misapplied funds, provided that the aggregate imprisonment shall not exceed five years.

D. Any person, contractor, subcontractor, or agent of a contractor or subcontractor who knowingly fails to apply construction contract payments as required in Subsection A shall pay to the court, and the court shall transfer to the person whose construction contract payments were misapplied, an amount equal to the sum of the payments not properly applied and any additional legal costs resulting from the misapplication of construction fund payments, including a fee charged by the clerk of court for handling such payments.

The obligation imposed upon contractors to properly apply money received from a construction contract by La. R.S. 14:202 as amended does not expressly create a trust and therefore does not change the analysis in this case.

14

a debt nondischargeable under section 523(a)(6) "a debtor must commit an intentional or substantially certain injury in order to be deprived of a discharge." *Id.* at 509.

Evidence established that Kim Weber induced the plaintiffs to give her money on December 2 and 19, 2008 by representing to Dennis Lytle that Lighthouse needed the payments to pay subcontractors or materialmen, and assured him that Lighthouse would forward payment to those creditors. She lied to Dennis Lytle when she told him that the sums would settle all costs remaining on the project, and later lawsuits by Central and Delta/Angelle corroborate her admission at the March 2009 meeting with Dennis Lytle that she and her husband diverted the plaintiffs' money to uses other than construction costs.

The evidence supports a finding that Kim Weber knew with substantial certainty that her actions would harm the plaintiffs. The evidence also shows that Kim Weber intended this harm. The plaintiffs have proven that the Kim Weber's debt to them is non-dischargeable under 11 U.S.C. §523(a)(6).

## CONCLUSION

The Lytles' claim against Kim Weber in the amount of $44,978 is non-dischargeable under 11 U.S.C. §523(a)(6). The plaintiffs' claims against Kim Weber and Scott Weber under 11 U.S.C. §§523(a)(2)(A) and (a)(4), and against Scott Weber under 11 U.S.C. §523(a)(6), are dismissed.

Baton Rouge, Louisiana, July 6, 2011.

<u>s/Douglas D. Dodd</u>
DOUGLAS D. DODD
UNITED STATES BANKRUPTCY JUDGE